**WESTINGHOUSE ELECTRIC CORP. v. INDUSTRIAL ELECTRONICS CORP.**

Civ. No. 6433.

United States District Court
D. New Jersey.
March 26, 1951.

George D. Richards, Newark, N. J., for plaintiff, Cooper, Byrne, Dunham, Keith and Dearborn, Thomas J. Byrne, Victor S. Beam, and William F. Kelly, New York City, of counsel.

Leroy J. D'Aloia, Newark, N. J., for defendant, Mock & Blum and Asher Blum, New York City, of counsel.

FAKE, Judge.

The plaintiff and defendant filed with the court the following Agreed Statement of Facts:

1. Plaintiff, Westinghouse Electric Corporation, is a Pennsylvania corporation and has its principal place of business at East Pittsburgh, Pennsylvania, and at least three plants within the State of New Jersey.

2. Defendant, Industrial Electronics Corporation, is a New Jersey corporation and has its principal place of business and a manufacturing plant at Newark, New Jersey.

3. This suit was brought for infringement upon the following United States patents:

"(a) No. 2,200,443, granted on May 15, 1940 to plaintiff (then named Westinghouse Electric & Manufacturing Company) as assignee of the applicant, Edward Charles Dench, for Discharge Lamp Circuit.

"(b) No. 2,228,210, granted January 17, 1941 to plaintiff (then named Westinghouse Electric & Manufacturing Company) as assignee of the applicant, Robert Fred Hays, Jr., for Gaseous Relay Device."

4. Since the grant of said patents in suit plaintiff has been and now is vested with title in and to the same.

5. This Court is vested with jurisdiction over the parties to this action and of the subject matter to the action.

6. The starter for fluorescent lamp (plaintiff's exhibit P–9) which is type FS–4, exemplifies starters which were made for and sold by defendant in the United States from about June, 1944 to about May, 1945, and made and sold by defendant from about May, 1945 until in the Fall of 1945.

7. The starter for fluorescent lamps, which is plaintiff's exhibit P–16 and which is referred to as type FS–2, exemplifies starters manufactured and sold in the United States by defendant beginning about September, 1945, and which have been made and sold since that time by defendant.

8. The FS–4 starter of the manufacture and sale of defendant (plaintiff's exhibit P–9) is shown in the sketch Exhibit P–7.

9. The FS–2 starter of the manufacture and sale of defendant (plaintiff's exhibit P–16) is shown in the sketch Exhibit P–7.

10. Plaintiff is engaged in making starters which plaintiff claims are made in accordance with the two patents in suit. A specimen of such starter is plaintiff's exhibit P–12 which is known by plaintiff as GS–4 starter. Plaintiff sells its starters to Bryant Electric Company, a wholly owned subsidiary of plaintiff. The Bryant Company included the starters (exemplified by exhibit P–12) with a condenser in a can and necessary wiring connections to two contacts on the cover of the can as exemplified by plaintiff's exhibits P–10 and P–11 which are Bryant FS–2 and Bryant FS–4 starters.

11. Plaintiff has manufactured and sold starters (exemplified by plaintiff's exhibit P–12) and which it claims are made according to the two patents in suit. It made and sold in all from in the year 1939 to and including the end of the year 1948 (estimated for November–December, 1948) in the amount of 45,000,000.

12. Plaintiff has shared its rights under the two patents in suit by granting 16 licenses to others to manufacture, use and sell complete devices embodying the inventions of the patents in suit and any other patents the inventions of which are improvements upon and subservient to inventions of the patents in suit. The 16 licenses referred to are in force and effect. The royalties received by plaintiff from its licensees from in the year 1939 to and in-

cluding the year 1947 is the sum of $257,-640.

13. Fluorescent lamps began to be a commercial factor in the year 1938. Fluorescent lamps were used in homes, offices, and other places where the line potential was of the order of 110 to 115 volts. The voltage referred to was not sufficient to start a fluorescent lamp. Consequently it was necessary to have a starter for fluorescent lamps which is usable in a circuit that would heat the electrodes of the fluorescent lamp and which employed a ballast so that by a surge of current from the ballast the lamp could be started. The voltage obtained on such a surge was anywhere from 400 to 600 volts. Such fluorescent lamps, because their electrodes were heated before they were started, were generally referred to as hot cathode lamps. One of the requirements was to provide a starting switch to put the lamp into operation immediately upon the closing of the wall or other switch as in the case of an incandescent lamp.

14. A starter was available at the early period of 1938. It is exemplified in patent to Wels No. 1,951,112 (plaintiff's exhibit P–3). The starter of the Wels patent was made by the General Electric Company. Plaintiff purchased some of the starters of the Wels type from General Electric Company. The Wels starter is the ordinary type of switch. It is one that required current all of the time the lamp is in operation in order to maintain normally closed contacts in open position.

15. The Dench device was so constructed and arranged that immediately upon application of the voltage, of say 115 volts, across the electrodes, the glow discharge is produced between the electrodes and the heat generated is sufficient to bring the electrodes into contact, with the attendant interruption upon cooling to produce a high voltage surge, and having a voltage breakdown sufficiently high that no current flows through the switch as long as the fluorescent lamp remains in operation.

The operating voltage of the Dench switch is thus confined to a much narrower voltage range than that of the fluorescent lamp.

The 15 and 20 watt fluorescent lamp, when lighted, operates on a voltage of 60 volts, less than the breakdown voltage necessary to produce the discharge in the switch. The 40 and 60 watt fluorescent lamps when lighted, operate on a voltage of 160 to 175 watts, less than the breakdown voltage necessary to produce the discharge in the switch. Dench therefore was, by reason of his device, able to obtain a balance of operation between the discharge in his starter and the discharge in the fluorescent lamp.

16. When bimetallic members of the switch therefore remain open, current passes through the discharge in the lamp but no discharge occurs in the starter. Therefore, no current is utilized in the switch during the operation of the fluorescent lamp. No waste of any energy occurs.

17. The Dench construction is organized and arranged so that the generation of heat will occur to move the bimetallic electrode to close the circuit and start the lamp.

18. In accomplishing this starting, Dench provided electrodes capable of passing an appreciable amount of current in either direction so that a continuous discharge and a continuous generation of heat occurs, to bring the electrodes into contact to start the lamp.

19. The accused device is a tiny bulb which is exemplified by P–7 and D–4. Plaintiff's witnesses Hammer and Freeman conceded that this was an old bulb with a bimetal strip, and that a bimetal strip as a separate part was old.

The two sketches of P–7 are identical. Each sketch shows a bulb, through which two parallel wires extend. A U-shaped piece of bimetal is fixed to one of said wires.

In one type of defendant's accused bulb, the bulb is filled with a mixture of gases, namely, argon, nitrogen and hydrogen. In this type, the pressure of those gases is about 20 millimeters of mercury. Since normal atmospheric pressure is 760 millimeters of mercury, this gas pressure of 20 millimeters of mercury is about 3.8% of

normal atmospheric pressure. In this type, the U-shaped piece of bimetal has a coating of zinc which emits electrons copiously when heated.

In defendant's second type, the gaseous filling of the bulb is substantially argon, with a pressure of about 13.5 millimeters of mercury, which is about 1.8% of normal atmospheric pressure. In this type, the U-shaped bimetal has a coating of magnesium, which emits electrons copiously when heated.

It is conceded that each said type produces a glow discharge.

20. The claims of the Dench patent in suit which are charged to be infringed are claims 7, 8 and 14.

21. The claims of Hays patent in suit which are charged to be infringed are the first seven claims. All of them are charged to be infringed by defendant's starter FS-4 and all of the seven claims, except claim 2, are charged to be infringed by defendant's starter FS-2.

22. Defendant was notified by plaintiff of Dench patent in suit No. 2,200,443 and Hays patent in suit No. 2,228,210 and of defendant's infringement thereon by letter dated September 12, 1944 and which letter was received on or about September 13, 1944.

23. That the surface area of the small electrodes in the FS-4 and FS-2 starters of the defendant which are involved in this action and which are shown on Exhibit P-7 is less than fifty percent of the surface area of the bimetallic electrodes of said starters and which bimetallic electrodes are shown on Exhibit P-7.

The Court, in addition thereto, finds the additional material and ultimate facts as follows:

1. The device of the Dench patent alone has never been put into commercial use by plaintiff.

2. There is no combination claim in issue between the Dench glow switch and the fluorescent lamp. The Dench glow switch could be used to open and close the circuit of an ordinary bulb.

3. Dench anticipated Hays in the idea of making one electrode of smaller area than the other electrode.

4. Dench merely used the idea of the old lightning arrester, as exemplified by Exhibit D-3. Tests proved that a commercial lightning arrester could be used.

5. Dench made no distinction between an arc discharge and a glow discharge.

6. The only substantial difference between Hays and the prior Dench patent, was that Hays used one small electrode. This change in size was old.

7. The Lems U. S. patent No. 1,937,373 issued October 24, 1933, discloses the patent in suit.

8. The difference in area between the electrodes of Hays is simple electrical design, old in the art, and produced no unexpected result.

### Conclusions of Law.

1. Claims 7, 8, and 14 of the Dench patent in suit No. 2,200,443 are invalid for the reasons set forth in an opinion filed herewith.

2. Claims 1, 2, 3, 4, 5, 6, and 7 of the Hays patent in suit, No. 2,228,210 are invalid for the reasons set forth in an opinion filed herewith.

3. If the patents are found valid on appeal, defendant infringes.

### Opinion.

This suit is based upon two patents owned by plaintiff, to wit; the Dench Patent No. 2,200,443, and the Hays Patent No. 2,228,210.

As to the Dench Patent, Claims 7, 8, and 14 are in suit. Claim 7 reads as follows: "A gaseous electric discharge device comprising a container provided with an ionizable medium therein, electrodes disposed in said container, one of said electrodes being adapted to emit electrons, and between which a discharge occurs upon the application of a relatively low potential thereto, and one of said electrodes being a bimetallic element adapted to be heated by the ensuing discharge and engageable with the remaining electrode to short-circuit the

discharge path and extinguish the discharge."

To understand the meaning and intent of the foregoing language resort is had to the specification, a study of which leads to the following:

The so-called gaseous discharge device is set up or encased within a glass bulb shown as No. 13 in the several drawings. The essential parts of the operative device are: One, a bimetallic electrode member shown as No. 23, adapted to receive heat created by electricity passing through a gaseous medium. Two, another electrode adapted to emit electrons to create a glow discharge while passing through the gaseous medium, thus generating heat which causes the member No. 23 to deflect into contact with electrode No. 19, short-circuiting or cutting off the glow discharge, but continuing the flow of electricity through the electrodes No. 19 and No. 23. The purpose of this device is to start a fluorescent light.

It is argued that the foregoing discloses nothing new in the art. The bimetallic members No. 19, and No. 23 are, and their functions as here disclosed are, in my opinion both old in the art as appears in the evidence in this case. Freeman, plaintiff's witness, testified as follows: Record page 256.

"Q. I am asking you back before January 1, 1938, and even prior thereto; as part of your college training, and what you knew previously, wasn't it the most obvious thing in the world, if I put a piece of bimetal in a glow discharge tube and excited the glow discharge, that the heat, which was a necessary concomitant of that glow discharge, would flex that bimetal?

"Mr. Byrne: If the Court please, I object to the introduction in the question of 'the most obvious thing in the world.' It seems we are dealing with facts, and if the facts are such, why, well and good, but—

"The Court: Well, the witness understands the question.

"A. After the combination is shown to a person, of course it becomes obvious.

"Q. No, I didn't ask you that. A. It isn't obvious—

"Q. Just a minute.

"The Court: Well, was that known prior to this date he has mentioned?

"The Witness: The combination of things—

"The Court: The application of heat to bimetal would cause it to flex? Yes or no.

"The Witness: That statement, yes, that was known.

"Q. It was known? A. That's right.

"Q. That was known. And it made no difference whether you produced the heat from a match or the heat of one of these electric incandescent lamps, or the heat of a glow discharge, the bimetal doesn't know the source of heat, isn't that true? A. The bimetal doesn't know the source of heat, but the combination of a glow discharge to produce heat to bend bimetal, I did not know of—

"Q. That's all right. A. —as of the time of the Dench Patent."

The creation of a glow discharge by the use of electrons passing through a gaseous medium is also old in the art as disclosed by the testimony of plaintiff's witness, Freeman, also: Record page 254.

"Q. That's all. Well, now, let's take up the first one, glow discharge. A glow discharge for at least twenty years prior to 1938 was produced by sending a current through a bulb which had two terminals and an outer glass wall hermetically sealed, isn't that true? A. Yes.

"Q. That was nothing but the most common, ordinary design; right? A. That's correct."

These elements or factors operate here as they have operated in the past, and therefore, produce no new or novel result. I, therefore, conclude that Claim 7 is invalid for lack of patentable invention.

Claim 8 sets forth everything disclosed in Claim 7 adding thereto, "Electrodes in said container provided with a coating which emits a copious flow of electrons when heated." See Element 22, Fig. 2, of the patent. This practice of coating electrons was old in the art. See testimony of Hammer: Record page 117.

"Q. Now, for how many years, to your knowledge has it been well known and largely used in the industry to coat metal with these oxides in order to provide a copious flow of electrons when heated? A. I do not know specifically as to the number of years but it was prior, we will say, to the date of the Dench application.

"Q. Well, did you ever hear of the Wehnelt, W-e-h-n-e-l-t, electrode? A. Yes.

"Q. And do you know that at least as far back as 1910, this man Wehnelt disclosed the coating of metal electrodes with these oxides in order to give you a copious emission of electrons when heated? A. Oh, yes, that's perfectly true."

Claim 14 repeats all the elements of Claims 7 and 8 and adds:

" * * * one of said electrodes being a bimetallic element provided with a contact terminal * * *." See No. 20 and No. 24 of Fig. 2. This does not arise to the dignity of patentable invention; it is a mere step in the art.

██ As to the Hays Patent No. 2,228,-210, it contains 8 claims, and Claims 1 through 7 are in issue. They relate to a gaseous electric discharge device for making and breaking an electric circuit with no loss of power.

The gist of the teaching of this patent is that it differs from Dench No. 2,200,443 in that here one electrode is made smaller than the other to reduce resistence, and therein lies its virtue. Plaintiff's expert, Mr. Freeman, testified on that point as follows: Record page 172.

"Q. Now, wherein does Hays differ outstandingly from Dench? A. In the smallness of one electrode, primarily.

"Q. And that only? A. That's the only important thing, I think, that concerns this case.

"Q. Which electrode? What is the number? A. Item 19 and the—that's just the contact point, but the lead wire it is attached to, which is not numbered, that protrudes out from the glass—or lead wire 17, the part that protrudes out from the glass, combined with 19, forming the small electrode.

"Q. And that, you say, is new? A. The fact that that is of very small area is an improvement which I believe is new and unique. It makes the Hays patent invention, that's right."

Record page 173.

"Q. Is it your thought that the reduction in size carried with it the spark of what we call invention? A. That's correct, as far as the Hays patent is concerned. Other things that are in there are improvements which I don't believe are inventions, or in my opinion shouldn't be discussed in this case."

and then, Record page 268, he testified:

"Q. No, please, I am not asking you about intentions. I am asking you a simple question: For how long prior to, let's say, January 1st, 1938, were there glow tubes on sale in this country, well known glow tubes, in which one electrode was smaller than the other? A. Well, I have known of those, and I would say at least ten years, perhaps even longer.

"Q. And—A. But not for the purpose of limiting current in one direction.

"Q. Let's assume that I take a glow tube and I make one of the electrodes just the size of a pinhead, tiny. Is that going to limit the flow of current through that glow tube? A. Yes.

"Q. How long has that been known? A. The size of the electrode related to the current carrying capacity I think has been known as long as ten or twelve years, perhaps longer, before the subject of these patents came up—let us say before 1938.

"Q. That was a common feature of design, wasn't it, for the purpose of limiting current consumption? A. It was expressed in this way—yes, I think the answer is yes; the size of a glow lamp was made bigger if it was to be one of carrying higher, larger amounts of current."

Each of the elements referred to above were old in the art and in this assemblage they functioned as before with no new, or additional result. The patents in suit are invalid.

An order will be entered to that effect.